IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| UNITED STATES OF AMERICA | |
| --- | --- |
| Plaintiff, | |
| v. | CRIMINAL NO.: 22-013 (RAM) |
| ERNESTO MÉNDEZ ROMÁN, | |
| Defendant. | |

## REPORT & RECOMMENDATION

### I.   PROCEDURAL BACKGROUND

Pending before the court is a motion by Defendant Ernesto Méndez Román

("Defendant") to suppress evidence pursuant to Franks v. Delaware, 438 U.S. 154 (1978). ECF

No. 47. On January 12, 2022, a grand jury returned a seven count indictment against Defendant,

charging him with possession of a firearm in furtherance of a drug trafficking crime in violation

of 18 U.S.C. § 924(c)(1)(A)(i), four counts of possession with intent to distribute a controlled

substance in violation of 21 U.S.C. § 841(a)(1), being a prohibited person in possession of a

firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), and possession of contraband in

prison in violation of 18 U.S.C. § 1791(a)(2). ECF No. 11 at 1–4. Defendant seeks the

suppression of incriminating evidence found as a result of the execution of two warrants for a

two story residence ("the residence") located in "Mariana Ward, Naguabo, Puerto Rico" on

December 24, 2021. ECF No. 47 at 2. The search of the residence was the result of a surveillance

operation conducted by the Puerto Rico Police Bureau ("PRPB") on December 20, 21, and 22,

2021. ECF No. 47 at 2; ECF No. 51 at 1. Defendant contends that a police officer participating in

that surveillance, Officer Luis Ríos Camacho ("Officer Ríos Camacho"), made false statements

and exhibited a "reckless disregard for the truth" in sworn statements that were used to obtain the

two search warrants from a Puerto Rico municipal judge which were used to search the residence on December 24, 2021. ECF No. 47 at 3–4, 15. Defendant argues that those false and reckless statements made the warrant "invalid on its face," and even after considering the remaining content of the sworn statements, there was not probable cause to search the residence requiring the suppression of any evidence found therein. ECF No. 47 at 18–19. After Defendant filed his present "Motion to Suppress with Request for a Frank's [sic] Hearing" the court granted Defendant's request for a <u>Franks</u> hearing which was subsequently held over three days on December 13, 2022, January 19, 2023, and March 10, 2023. ECF Nos. 86, 91, 108.

## II.   FACTUAL BACKGROUND

Puerto Rico Police Officers Ríos Camacho and José Díaz ("Officer Díaz") conducted a surveillance operation of the residence in Naguabo, Puerto Rico from December 20 to December 22, 2021. ECF No. 47 at 2; ECF No. 51 at 1; ECF No. 104 at 80, 88, 100; ECF No. 105 at 200. Ms. Carla Mercado Colón ("Ms. Mercado Colón"), Defendant's consensual partner, testified that she, Defendant, her father, and her three children lived in the residence. ECF No. 104 at 18. She and Defendant lived on the second floor with her father and her two sons while her daughter lived on the first floor. ECF No. 104 at 18.[1] On the basis of the police surveillance conducted on those dates, Officer Ríos Camacho prepared two search warrant applications on December 22,

---

[1] Ms. Mercado Colón testified explained that Defendant only had access to the first floor "apartment" of the house if her daughter opened the door for Defendant and that Defendant had no property inside the apartment below. ECF No. 104 at 18–19. At the <u>Franks</u> hearing, Defendant also presented the testimony of Katiushkarelis Medina Mercado ("Ms. Medina Mercado"), ECF No. 112 at 71. Ms. Medina Mercado identified herself as the daughter who lived on the first floor of the residence and testified that her mother lived upstairs with her brothers and with Defendant. ECF No. 112 at 71. Although the defense argued that it "is in dispute" whether the items found during the search were on the first or the second floor of the residence, no evidence was introduced at the <u>Franks</u> hearing regarding the location of the contraband found during the search of December 24, 2021 which would warrant suppression on the basis of either Ms. Mercado Colón's or Ms. Medina Mercado's testimony. ECF No. 104 at 5. Furthermore, according to the sworn statements in the warrant applications, Officer Ríos Camacho stated that when he saw Defendant enter the bottom floor for a few seconds after coming down from the first floor, "the door of the first level . . . was open" and Defendant "closed the door of the first level" before getting in the stolen vehicle and leaving the residence. Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 15. Therefore, the testimony by Ms. Mercado Colón and Ms. Medina Mercado is not inconsistent with the sworn statements. Even if Defendant normally would not have been able to access the bottom floor, he could have freely entered if the door had been left open.

2021, both of which included a "Sworn Statement" attesting to the same set of facts described below. ECF No. 104 at 84; Exhibit D, ECF No. 111-28; Exhibit E, ECF No. 111-29. Officer Ríos Camacho's sworn statements assert that he was assigned to "gather intelligence relating to various murders that occurred in the town of Fajardo due to the control of drug points" and state that "[t]he investigation carried out shows that [Ernesto Méndez Román] a.k.a. Cano is living in the town of Naguabo, Mariana ward, and he is a leader of the criminal organization of the Pedro Rosario Nieves Housing Project." Exhibit D, ECF No. 111-28 at 10; Exhibit E, ECF No. 111-29 at 14–15.

The sworn statements communicate that on December 20, 2021 Officer Ríos Camacho traveled to "the residence" in a confidential police vehicle and at approximately 3:00 PM visually identified Defendant "wearing black shorts and a black sweater with a black cap . . . smoking in the garage area next to a blue Toyota Yaris vehicle." Exhibit D, ECF No. 111-28 at 10; Exhibit E, ECF No. 111-29 at 15. Officer Ríos Camacho's sworn statements describe how "[a]fter several minutes I observed that [Defendant] went up to the second level of the residence by using the stairs next to it, entering through the first aluminum door that was open[.]" Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 15. According to the sworn statements, after several more minutes Officer Ríos Camacho saw a "woman with black skin" with "two minors, a boy and a girl" exit the second floor of the residence, descend the stairs, and get into the blue Toyota Yaris. Exhibit D, ECF No. 111-28 at 10–11; Exhibit E, ECF No. 111-29 at 15. The sworn statements explain,

> I then observed that the individual under investigation [Defendant] a.k.a. Cano left the residence on the second level on this occasion with a white bag across the neck area. He closed the door and looked for something inside the bag he had, where I observed that he took out a black pistol from inside the bag and put it on the top of a column in the balcony area, then he continued looking inside the bag and stopped in front of the door of the residence, closing it with a key, he took the pistol and put it back in the bag[.]

3

Exhibit D, ECF No. 111-28 at 10–11; Exhibit E, ECF No. 111-29 at 15. According to the sworn statements, Officer Ríos Camacho then observed Defendant go down the stairs from the second floor of the residence, briefly enter and exit the open door of the first floor of the residence, climb into the blue Toyota Yaris, and then leave the residence in that vehicle. Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 15. The sworn statements also specify that the blue Toyota Yaris "license plate JBW 710" has a "theft lien." Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 15. The sworn statements further describe how Officer Ríos Camacho returned to the area of the residence on December 21 and December 22, 2021 where he again observed Defendant and the presence of the blue Toyota Yaris with license plate "JBW 710" at the residence. Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 15.

As a result of the above surveillance, Officer Ríos Camacho's warrant applications state that "[b]ased on my experience as an Agent of the Puerto Rico Police, I consider that in the RESIDENCE DESCRIBED ABOVE (TWO LEVELS), [is] being used for the storage of firearms and a stolen vehicle, for which reason it is very respectfully requested that should this Court find probable cause, it should issue a search and seizure order to be executed day or night against said residence to seize all evidence in violation of the Weapons Law, Act 8 or other illegal articles." Exhibit D, ECF No. 111-28 at 12; Exhibit E, ECF No. 111-29 at 16. The warrant applications also contain a precise description of the residence in question and instructions to arrive at the residence. Exhibit D, ECF No. 111-28 at 12; Exhibit E, ECF No. 111-29 at 16. Based on Officer Ríos Camacho's warrant applications, two search warrants—one for the first floor and one for the second floor of the residence—were granted by a Puerto Rico Municipal Judge in Fajardo, Puerto Rico on December 22, 2021 and the search warrants were executed on December 24, 2021. ECF No. 105 at 164, 174, 192–94; Exhibit D, ECF No. 111-28 at 12; Exhibit E, ECF No. 111-29 at 16. It is undisputed by the parties that in the search of the

4

residence, police found a pistol, a stolen vehicle, and other incriminating evidence, including controlled substances. ECF No. 47 at 2; ECF No. 51 at 3; ECF No. 53 at 5.

## III.   LEGAL STANDARD

A defendant is entitled to a suppression hearing under Franks v. Delaware, 438 U.S. 154 (1978) if he makes a "substantial preliminary showing" that a false statement or omission in the affidavit in the warrant application "was made knowingly and intentionally or with reckless disregard for the truth" and that the false statement or omission was "necessary to the finding of probable cause." United States v. Arias, 848 F.3d 504, 511 (1st Cir. 2017) (quoting United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015)). Once granted a hearing, the defendant is only entitled to the suppression of evidence obtained under the challenged warrant if he shows by a preponderance of the evidence both (1) "that an affidavit in [the] warrant application contains false statements or omissions, made intentionally or with reckless disregard for the truth," and (2) "that a finding of probable cause would not have been made without those false statements or omissions[.]" Id. (citing United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015)).

## IV.   ANALYSIS

### A.   WHETHER THE CAMERAS AT THE RESIDENCE SHOW A FALSEHOOD OR RECKLESS DISREGARD FOR THE TRUTH

In Defendant's motion to suppress and requesting a Franks hearing, Defendant argues extensively that Officer Ríos Camacho's version of events found in the sworn statements of the warrant applications cannot be entirely true because some of the events described by Officer Camacho – such as the presence of a firearm – were not captured by a security camera at the residence during the dates of the surveillance. ECF No. 47 at 4–7. However, the evidence regarding the security camera introduced at the Franks hearing did not establish by a

preponderance of the evidence that Officer Ríos Camacho made intentional false statements or omissions or acted with reckless disregard for the truth.

In her testimony, Ms. Mercado Colón explained that the residence had a security camera located in the far right window of the second floor of the house if observed from the street. ECF No. 104 at 19–21; Exhibit B, ECF No. 111-27. Ms. Mercado Colón stated that the camera had been installed roughly two to three weeks after she and Defendant moved into the residence in approximately August, 2022. ECF No. 104 at 22–23. Ms. Mercado Colón recalled that the camera was installed, functioning properly, and recording on December 20 through December 22, 2021, during the time of the surveillance in question. ECF No. 104 at 23. However, this camera did not record constantly. Instead when the camera detected motion in front of it, it would record for a maximum of twelve seconds. ECF No. 104 at 24, 41. Ms. Mercado Colón stated that any videos would then be sent to her phone, Defendant's phone, and the phones of her son and daughter. ECF No. 104 at 24, 46. Each recipient would have the option to either save or delete the video. ECF No. 104 at 24, 46.

For the three days of the surveillance on December 20, 21, and 22, 2021, Ms. Mercado Colón testified that "[e]verything that was taped I sent to [Defense] counsel." ECF No. 104 at 59. The videos in Defense counsel's possession were introduced into evidence as Exhibit C. Despite the fact that Ms. Mercado Colón did not know that the residence was being surveilled on December 20, 21, and 22, 2021, she asserted that she inexplicably decided to save only the videos from those three days in December 2021. ECF No. 104 at 54. Such a claim is not credible. Ms. Mercado Colón gave no further explanation as to why she serendipitously saved all the videos on the exact three days when her residence was being surveilled, despite not knowing about the surveillance. When pressed, she only reiterated that "I saved them." ECF No. 104 at 54. Furthermore, when pressed on cross examination as to whether she indeed saved *all* of the

videos taken by the camera on the three days in question, Ms. Mercado Colón's responded, "The ones that I kept, yes" and "All the ones that I kept are the ones that counsel has[.]" ECF No. 104 at 55. These answers imply that there were other videos from those three days which she did not keep and therefore did not send to Defense counsel.

Indeed, on cross examination the Government adduced testimony from Ms. Mercado Colón in which she affirmed that there was other activity in front of the house on December 22, 2021 that was either was not recorded by the camera or that was not kept and sent to Defense counsel. ECF No. 104 at 55. For example, there is no video evidence showing either the arrival or departure of a white vehicle which is at one point seen parked in front of the house but is absent in other videos. ECF No. 104 at 55, 57, 59. Ms. Mercado Colón testified that the white car was only on the property "not more than two hours" on December 22, 2021. ECF No. 104 at 59. She agreed that the movement of the car arriving and departing from the driveway would have been detected by the camera and recorded. ECF No. 104 at 57–58, 59. However, no video depicting either the arrival or departure of the white car from December 22, 2021 was introduced into evidence, and Ms. Mercado Colón stated that she could not recall whether she had provided a video of the white car arriving or departing to Defense counsel. ECF No. 104 at 60. Ms. Mercado Colón admitted on cross examination that it possible that she did not save the video depicting the white car's movement and admitted that she did in fact choose which videos to save "or not" save from the three days in question. ECF No. 104 at 58.

In short, Ms. Mercado Colón's testimony reveals only that either (1) the camera does not reliably record all movement which occurs in front of it, or (2) Ms. Mercado Colón did not, as she alleges, save and send *all* the videos which were recorded on the three days in question to defense counsel. Either way, the record is clear that the videos introduced into evidence do not conclusively depict all the movement or activity which occurred in front of the residence on

December 20, 21, and 22, 2021. Therefore, the absence of a video depicting Defendant removing a pistol from a white fanny pack on the balcony does not show by a preponderance of the evidence that Officer Ríos Camacho was lying or exhibited a reckless disregard for the truth when he described such events in the warrant applications. The camera may not have recorded Defendant extracting a gun from the fanny pack, or Ms. Mercado Colón may not have saved and sent any video depicting Defendant pulling out the gun to Defense counsel. As Defendant's consensual partner, Ms. Mercado Colón had a motive not to save any videos from the surveillance camera which potentially depicted Defendant engaging in unlawful activity.

Additionally, Officer Ríos Camacho's testimony at the Franks hearing was that he observed Defendant exit the second floor of the residence through the door that is furthest to the right when the house is viewed from the front. ECF No. 104 at 107. This door is immediately to the left of the location of the camera. According to Officer Ríos Camacho, when he saw the Defendant pull the pistol from the fanny pack, Defendant placed the pistol on the fourth column of seven if counted from the far right of the second-floor balcony. ECF No. 104 at 96, 107–108; ECF No. 105 at 159–60, 163; Exhibit N, ECF No. 111-34; Exhibit 22, ECF No. 110-4. As can be seen in the videos introduced into evidence as Exhibit C, the camera's angle of view only captures the first two columns of the balcony and does not record the column identified by Officer Ríos Camacho as the one upon which Defendant placed the pistol. Compare Exhibit C, with Exhibit N, ECF No. 111-34. As such, according to Officer Ríos Camacho's testimony, the camera would not have recorded Defendant taking out the pistol and placing it on the column even if all the recordings had been saved and sent to Defense counsel. For the foregoing reasons, the video evidence introduced at the Franks hearing does not show by a preponderance of the evidence that Officer Ríos Camacho's sworn statements in the warrant applications contained an intentionally false statement or statements made with a reckless disregard for the truth. No

8

evidence found in the search of the residence should therefore be suppressed on the basis of the videorecorded evidence.

### B. WHETHER OFFICER RÍOS CAMACHO COULD SEE A PISTOL ON DECEMBER 20, 2021

Next, Defendant also challenges Officer Ríos Camacho's assertion in the sworn statements that Officer Ríos Camacho could see "from his car, hundreds of feet away, [Defendant] remove a firearm from a white fanny pack[.]" ECF No. 47 at 10. Four witnesses, including an investigator and an expert witness, testified regarding this issue at the Franks hearing. Based on the testimony, as explained below, Defendant succeeds in showing by a preponderance of the evidence Officer Ríos Camacho's claim of having seen a gun in the sworn statements of the warrant applications was made with reckless disregard for the truth.

#### 1. Evidence Introduced at the Franks Hearing Regarding the Pistol

##### a. Testimony of PRPB Officer Luis Ríos Camacho

In preparation for the surveillance operation undertaken on December 20, 21, and 22, 2021, Officer Ríos Camacho testified that on December 20, 2021 he received a surveillance plan which identified Defendant as the target of the surveillance. ECF No. 104 at 99–100. At the time, Officer Ríos Camacho was already familiar with the Defendant, explaining that as a member of the PRPB Homicide Division, he was aware of Defendant's identity because Defendant was under investigation "for several murders in the Fajardo area" and in relation to the operation of "drug points." ECF No. 104 at 101. The surveillance plan also assigned Officer José Díaz to accompany Officer Ríos Camacho during the surveillance in a support role. ECF No. 105 at 156–57. Officer Ríos Camacho explained that for surveillance operations, he typically uses equipment such as "binoculars" and a "portable radio." ECF No. 104 at 83. However, he testified that he did not use binoculars at any time when conducting the surveillance of Defendant on

9

December 20, 2023 because he did not need them. ECF No. 104 at 93–94; ECF No. 105 at 163.[2]
During the surveillance conducted on December 20, 2021, Officer Ríos Camacho stated that he was the passenger in an unmarked police vehicle (hereinafter the "police vehicle" or "undercover vehicle") which he and Officer Díaz used to conduct the surveillance. ECF No. 104 at 116, ECF No. 105 at 158, 192, 201. Officer Ríos Camacho further explained that on some occasions during the surveillance the police vehicle was in movement, while on other occasions it was parked pursuant to "surveillance techniques." ECF No. 104 at 112.

Officer Ríos Camacho explained that when he and Officer Díaz arrived near the location of the residence at about 3:00 PM on December 20, 2021, the police vehicle was in movement on a "main road" that runs to the parallel of the right side of the house when the residence is viewed from the front. ECF No. 109–110, 113. During the evidentiary hearing, Officer Ríos Camacho visually identified that "main road" running parallel to the residence by drawing a red line on the road in a photo taken from Google Earth. ECF No. 104 at 116; Exhibit O, ECF No. 111–35. Officer Ríos Camacho also explained that when he first saw Defendant "smoking in the garage area next to a blue Toyota Yaris vehicle" at around 3:00 PM on December 20, 2021, the officers' police vehicle was on the "main road" running parallel of the right side of the house. ECF No. 104 at 109–110, 112, 113; Exhibit D, ECF No. 111-28 at 10; Exhibit E, ECF No. 111–29 at 15. When asked to identify where exactly he had first seen Defendant at around 3:00 PM on December 20, 2021, Officer Ríos Camacho placed a red "X" on an image taken from Google Earth to indicate his position on the main road and a red circle to indicate the location of the residence. ECF No. 104 at 118 at 117–118; Exhibit P, ECF No. 111-36.

---

[2] Officer Ríos Camacho testified that when he used binoculars during a surveillance operation, they were not assigned to him by the Puerto Rico Police Bureau, but rather he used his own personal binoculars. ECF No. 104 at 91, 93. However, Officer Ríos Camacho made clear that he never used binoculars, personal or otherwise, while surveilling Defendant on December 20, 21, or 22, 2023. ECF No. 104 at 93. Officer Ríos Camacho also testified that at no time did Officer Díaz use binoculars. ECF No. 105 at 175.

"Several minutes later" Officer Ríos stated that he observed a black woman with two minor children exit the second floor of the residence and go down the stairs and enter a car. ECF No. 104 at 95, 120–21. The stairs of the residence from the first to second floors are located on the outside of the structure on the right hand side, when viewed from the front. ECF No. 105 at 178–79; Exhibit U, ECF No. 111-41 (marked with two red "X's"). Officer Ríos Camacho was also asked to mark on the same image from Google Earth his location when he had first seen "the black woman . . . with the two children" exit the second floor of the residence, go down the stairs, and get into the car. ECF No. 104 at 119–120. Officer Ríos Camacho explained that the police vehicle was at that point parked on the main road and placed another "X" on the image to indicate his location. ECF No. 104 at 119–120; Exhibit Q, ECF No. 111-37.

"[L]ess than ten" minutes after seeing the black woman and children leave the second floor of the residence and enter the car, Officer Ríos Camacho described how then he observed Defendant also exit the second floor of the residence through the door that is furthest to the right when the house is viewed from the front. ECF No. 104 at 107. At that moment, Officer Ríos Camacho testified that the police vehicle was still "parked" in the same location where it was when he saw the black woman and the children leave the second floor of the residence, but that as soon as Defendant exited onto the second floor balcony the officers in their vehicle began moving toward the residence. ECF No. 104 at 109, 112, 120–121; ECF No. 105 at 159; see Exhibit Q, ECF No. 111-37. Officer Ríos Camacho testified that he then saw Defendant pull a black pistol from a white "fanny pack" hanging around Defendant's neck and place the pistol on a column on the balcony far to the left of the second floor doorway.[3] ECF No. 104 at 96, 107–108; ECF No. 105 at 159–60, 163; Exhibit N, ECF No. 111-34; Exhibit 22, ECF No. 110-4.

---

[3] Unless indicated otherwise, the terms left, right, front, and back will be given from the perspective of someone who is facing the front entrance of the house.

Officer Ríos Camacho explained that he was able to identify the item which Defendant pulled from the fanny pack as a pistol based on his training and experience with firearms and based on the shape and color of the item and the manner in which Defendant was handling it. ECF No. 105 at 159–60.[4] Officer Ríos Camacho did not provide any specifics to how exactly Defendant handled the item in a way which would indicate it was a pistol. At the evidentiary hearing, Officer Ríos Camacho was asked to indicate with a red "X" his location at the time he saw Defendant's weapon. ECF No. 104 at 122. Officer Ríos Camacho placed on the same Google Earth image a red "X" indicating his location on the main road when he saw the pistol, and the marked image was admitted as Exhibit R. ECF No. 104 at 122; Exhibit R, ECF No. 111-38. Officer Ríos Camacho testified that at the moment he saw Defendant place the pistol on the column, the police vehicle was still "approaching the residence" on the "main road" running to the right of the residence. ECF No. 104 at 112.

Finally, according to Officer Ríos Camacho, he observed the Defendant put the pistol back into the fanny pack and descend from the second floor of the residence and enter the driver's seat of a Toyota Yaris which was later identified as a stolen vehicle. ECF No. 104 at 97; ECF No. 105 at 164. Officer Ríos Camacho then observed Defendant, the woman, and the two minor children leave the premises of the residence in the stolen vehicle. ECF No. 164 at 105. At the Franks hearing Officer Ríos Camacho placed a red "X" on the same Google Earth image to indicate his location at the time he saw the Defendant leave the residence in the stolen car. ECF No. 104 at 122–23; Exhibit S, ECF No. 111-39. Officer Ríos Camacho's marking indicates that the police vehicle was then located on a different road running in front of the residence which is perpendicular to the "main road." ECF No. 104 at 123; Exhibit S, ECF No. 111-39. After

---

[4] Regarding his training and experience, Officer Ríos Camacho explained that he has owned personal firearms since 2008 and has received bi-annual firearms training in both theory and tactics as a Puerto Rico Police officer since 2010. ECF No. 105 at 155; see ECF No. 104 at 80.

Defendant left the residence, Officer Ríos Camacho continued to surveil the house for approximately an additional "two hours" on December 20, 2021, but did not observe anyone else in the house, leave the house, or walking around the property. ECF No. 104 at 105.

After having conducted additional surveillance on December 21 and 22, 2021, Officer Ríos Camacho testified that, without help from Officer Díaz, he prepared the sworn statements and search warrant applications for the residence which are at issue in the Franks hearing. ECF No. 105 at 170. The search warrants were granted and executed on December 24, 2021, and Officer Ríos Camacho was later informed that a black pistol and the stolen vehicle were both found at the residence. ECF No. 105 at 164, 174, 192–94.

### b. Testimony of Police Officer José Díaz

Officer Díaz, who accompanied Officer Ríos Camacho in a support role during the surveillance of December 20, 21, and 22, 2021, also testified at the Franks hearing. ECF No. 105 at 195. In describing his role on those dates, Officer Díaz stated that he "was only to provide security for Agent Ríos [Camacho] while he carried on the investigation" and repeatedly stated that he did not conduct any surveillance of Defendant during the three days of the operation. ECF No. 105 at 197, 198, 199, 205. Officer Díaz explained that on the dates of the surveillance, Defendant was presumed armed and dangerous because he was suspected of being an "enforcer" for a "criminal organization" operating in Fajardo and Naguabo, Puerto Rico. ECF No. 105 at 203. Officer Díaz testified that he personally saw Defendant at the residence being surveilled on December 20, 2021. ECF No. 105 at 207. During the surveillance, Officer Díaz recalled that Officer Ríos Camacho "communicated to me that [Defendant] had a weapon." ECF No. 105 at 209. He explained that "[w]hile the surveillance was being conducted, we moved towards the residence . . . and [Officer Ríos Camacho] expressed at some point in time" that Defendant had a "weapon or pistol[.]" ECF No. 105 at 208. When asked to specify when Officer Ríos Camacho

communicated that information to him, Officer Díaz stated that it was "[w]hen we were in the entrance going toward [Defendant's] house." ECF No. 105 at 207. However, Officer Díaz stated more than once during his testimony that he did not personally observe Defendant in the possession of any weapon on December 20, 2021. ECF No. 105 at 199, 208, 209.

### c. Testimony of Defendant's Private Investigator José Meléndez Cruz

During the <u>Franks</u> hearing, Defendant also called his Private Investigator, Mr. José Meléndez Cruz ("Mr. Meléndez Cruz" or "the Private Investigator") to testify regarding his investigation of certain details of Officer Ríos Camacho's testimony. ECF No. 105 at 213–14. As part of his investigation, Mr. Meléndez Cruz reviewed the search warrants and accompanying sworn statements and traveled to the area of the residence which was surveilled on December 20, 21, and 22, 2021. ECF No. 105 at 216, 218. On January 16, 2023 Mr. Meléndez Cruz examined the surveillance points identified by Officer Ríos Camacho in his testimony. ECF No. 105 at 245.[5] Mr. Meléndez Cruz also explained that Defense counsel had sent him Exhibits P, Q, R, and S—the Google Earth images containing the markings from Officer Ríos Camacho indicating his locations on December 20, 2021—in order to conduct his investigation around the residence. ECF No. 105 at 246.

Mr. Meléndez Cruz testified that using the aforementioned exhibits he located the points using Google Earth which Officer Ríos Camacho had indicated using a red "X" in each of the exhibits. ECF No. 105 at 246–247. From each of those points, Mr. Meléndez Cruz explained that

---

[5] This was Mr. Meléndez Cruz's second visit to the area around the residence in question. ECF No. 105 at 245. The first visit, around December 2022, is not relevant to the court's analysis. By the time Mr. Meléndez Cruz went to the property a second time on January 16, 2022, Officer Ríos Camacho had testified regarding his locations during the surveillance of Defendant on December 20, 2021. Due to scheduling conflicts with the parties, the court had to split Officer Ríos Camacho's testimony between two dates. The first part of his testimony where he identified the locations where he conducted surveillance was heard on December 13, 2022. ECF No. 86. The second part of his testimony was heard on January 19, 2023 (ECF No. 91), after Mr. Meléndez Cruz had visited the location of the residence to examine the locations identified in Officer Ríos Camacho's first day of testimony. See ECF No. 105 at 245, 285–86.

he measured in feet the distance to the residence using a tool in Google Earth. ECF No. 105 at 251. At each of the locations, Mr. Meléndez Cruz also took photographs which, combined with the distance measurements, he used to prepare a number of exhibits admitted as Exhibits V-1 through V-5. ECF No. 105 at 246–47, 251, 252, 253.

Based on those exhibits and Mr. Meléndez Cruz's testimony, those measurements indicate that Officer Ríos Camacho was 749 feet away from the residence when he first saw Defendant smoking at 3:00 pm on December 20, 2021 (ECF No. 105 at 260, 262; Exhibit V-3, ECF No. 111-44); 516 feet away from the residence when he saw the "black woman" with the minor children exit the second floor of the residence (ECF No. 105 at 265; Exhibit V-4, ECF No. 111-45);[6] and 598 feet away from the entrance to the residence when he saw Defendant leave in the stolen vehicle. ECF No. 105 at 257–59, 273; Exhibit V-1, ECF No. 111-42.[7] Most relevant to the issues in this <u>Franks</u> hearing, Mr. Meléndez Cruz testified that he used Exhibit R—the exhibit showing where Officer Ríos Camacho had indicated that he saw Defendant withdraw a pistol from the fanny pack—to formulate Exhibit V-5, which shows both the private investigator's photographs taken from the point indicated by Officer Ríos Camacho and a measurement in feet of the distance from that point to the residence. ECF No. 105 at 269–70;

---

[6] After first identifying Exhibit V-4 as being created with Exhibit Q (the location where Officer Ríos Camacho saw the "black woman" and the minor children), Mr. Meléndez Cruz later inconsistently stated that Exhibit V-4 was created using Exhibit P (the location where Officer Ríos Camacho first saw Defendant at 3:00 PM on December 20, 2021). ECF No. 105 at 265, 267. However, Mr. Meléndez Cruz previously identified Exhibit P as the exhibit used to create Exhibit V-3, not Exhibit V-4. ECF No. 105 at 260, 262. Because Mr. Meléndez Cruz had already identified Exhibit V-3 as relating to Exhibit P, Mr. Meléndez Cruz's original testimony identifying Exhibit V-3 with Exhibit P and Exhibit V-4 with Exhibit Q is the most credible relationship between these exhibits.

[7] More than once, Defendant seemed to make an issue of the fact that from a certain number of the locations marked with an "X" by Officer Ríos Camacho, the subsequent photos taken over a year later by Mr. Meléndez Cruz show that at that specific location, Mr. Meléndez Cruz could not see the residence due to certain obstructions such as "weeds", trees, and foliage. ECF No. 105 at 261–62, 270. This evidence is not given much weight for various reasons. First, weeds and the foliage of trees can change over time, and the photos by Mr. Meléndez Cruz were taken on January 16, 2023, which was more than a year after the surveillance in question (ECF No. 105 at 285). Second, Officer Ríos Camacho testified that at various points of the surveillance, the police vehicle was in movement, making a precise identification of a location at a specific time more difficult. However, even if some leeway is given, I am convinced, as explained below, that the overall distances were too great for Officer Ríos Camacho to have identified a pistol in Defendant's hand on December 20, 2021.

Exhibit V-5, ECF No. 111-46. Mr. Meléndez Cruz testified that the point from where Officer Ríos Camacho indicated he saw the pistol to the residence measures 449 feet. ECF No. 105 at 270; Exhibit V-5, ECF No. 111-46. Mr. Meléndez Cruz further explained that before becoming a private investigator he had served as a police officer for twenty-three years, during which time he received extensive firearms training. ECF No. 105 at 271–72. Based on that experience, he testified that with "the naked eye" and without the aid of binoculars he does not believe that he would have been able to see a firearm at a distance of 449 feet—the distance that Officer Ríos Camacho testified that he saw a pistol in Defendant's hand. ECF No. 105 at 274.

### d. Testimony of Expert Witness Dr. Geoffrey Loftus

Dr. Geoffrey Loftus ("Dr. Loftus"), emeritus professor at the University of Washington, also testified at the <u>Franks</u> hearing via videoconference and was deemed an expert in memory and perception. ECF No. 112 at 5; Exhibit AA, ECF No. 111-76 at 1. Dr. Loftus explained he had conducted research on "the loss of visual information associated with being a particular distance away from whatever object you are looking at", and that his purpose for testifying at the <u>Franks</u> hearing was "to testify about this research and . . . the ability of a police officer to reliably perceive the presence of a gun at specific distances." ECF No. 112 at 10. Dr. Loftus testified that the loss of visual information for any object can be expressed in blurriness, with greater blurriness corresponding to greater distance as visual information is lost. ECF No. 112 at 13–14. Based on his research, Dr. Loftus testified that he had created a computer program which can take any clear image of an object "a face, a gun, a car, a snake, whatever, and blur an initially clear image to represent how it would appear to the visual system of a person looking at it from any specific distance." ECF No. 112 at 13. The effect in the program is produced by providing the program with the original clear image and then inputting the distance to determine blurriness. ECF No. 112 at 14. "In other words," Dr. Loftus explained that for each image "if you were

16

somehow able to take the perception of the viewer and blow it up and project it on a screen, that's what it would look like if the viewer were seeing that person holding that object from" any given distance. ECF No. 112 at 33.

For the purposes of his testimony for this <u>Franks</u> hearing, Dr. Loftus produced eight images from two original photographs provided by Defense counsel, which were altered to represent the degree of blurriness at each of the four distances established in testimony during the <u>Franks</u> hearing. ECF No. 112 at 17–18, 23, 25; Exhibits BB1–BB10. The original images provided to Dr. Loftus depicts a man wearing a black shirt and black shorts withdrawing a black cellphone from a white bag. Exhibits BB-1, BB-6. From that image, Dr. Loftus created blurred images which corresponded to distances of 449 feet, 516 feet, 598 feet, and 749 feet. ECF No. 112 at 18, 38–39. In producing the images which were introduced into evidence, Dr. Loftus read the transcripts of the Franks hearing, focusing on the testimony of Officer Ríos Camacho and Private Investigator Meléndez Cruz. ECF No. 112 at 16. Dr. Loftus also examined Exhibits P, Q, R, and S identifying Officer Ríos Camacho's locations where he allegedly saw certain events during his surveillance on December 20, 2021, as well as Exhibits V1, V2, V3, V3, and V5 prepared by Private Investigator Meléndez Cruz and measuring the distances between Officer Ríos Camacho's locations and the residence. ECF No. 112 at 16. Dr. Loftus then labeled the file name of each image with a number indicating the distance which each image represents. ECF No. 112 at 29, 31; <u>see</u> Exhibits BB-1–BB-10.

Dr. Loftus explained that the computer program which produced the blurriness in the images is designed to replicate the visual acuity of "the average person" with 20/20 vision and that the images "presuppose that all other factors that would affect perception were optimal" such as optimal lighting, stress, attention, and that the viewer was not under the influence of

drugs or alcohol. ECF No. 112 at 15, 37, 39, 48, 55–56, 63–64.[8] The images also presume that

the viewer was not in movement and had a clear unobstructed view of the target. ECF No. 112 at

38, 64. Dr. Loftus identified one of the blurred photographs—Exhibit BB-5—as the photo which

represents the degree of blurriness that would appear to the average human eye at 449 feet, the

distance which Officer Ríos Camacho testified that he saw Defendant pull a gun from the fanny

pack. ECF No. 112 at 27.[9] As can be discerned from looking at Exhibit BB-5, the image is

extremely blurred, and while it is possible to identify the subject as a person with short hair, light

skin, and a black shirt, it is difficult to determine what is being held in the subject's hands—if

anything at all. Exhibit BB-5. If it could be said with any certainty that the subject is holding an

item in his right hand, it is impossible to distinguish whether that item is a gun, cell phone,

hairbrush, wallet, or any other item. Exhibit BB-5.[10]

### 2. Credibility Determinations and Findings of Fact

All of the aforementioned testimony succeeds in showing by a preponderance of the

evidence that Officer Ríos Camacho may have guessed that he saw Defendant in the possession

of a pistol on December 20, 2021, but due to the distance at which he observed Defendant it was

impossible to conclude that it was probable that the item in Defendant's hand was a pistol. For

---

[8] Dr. Loftus acknowledged, however, that a police officer observing an event may be less affected by stress than a lay person. ECF No. 112 at 42–43, 46. Dr. Loftus also stated that in this case, because the observation was made at around 3:00 PM in the afternoon, he was not aware of lighting having been an environmental factor which affected Officer Ríos Camacho's perception on December 20, 2021. ECF No. 112 at 55–56.

[9] Dr. Loftus incorrectly construed Officer Ríos Camacho's and Mr. Meléndez Cruz's testimony to be that Officer Camacho observed Defendant with a gun from 598 feet, when instead the testimony in the record was that the gun was first seen at a distance of 449 feet. Compare ECF No. 112 at 17 with ECF No. 105 at 270; Exhibit V-5, ECF No. 111-46. The blurriness among the images was so similar that Dr. Loftus had difficulty distinguishing which image corresponded to each distance. ECF No. 112 at 27, 28.

[10] The images that Defendant provided to Dr. Loftus depicts a man wearing a black shirt holding a black cellphone to his chest. Exhibits BB-1, BB-6. This combination of the black cell phone against the black shirt makes the item particularly difficult to identify. While the search warrant affidavits indicate that when Officer Ríos Camacho first saw Defendant outside the residence on December 20, 2021, Defendant was wearing a "black sweater", there is no description in the search warrant affidavits or in Officer Ríos Camacho's testimony regarding what color Defendant was wearing when he exited the second floor of the residence and withdrew the gun from the fanny pack. See Exhibit D, ECF No. 111-28 at 10; Exhibit E, ECF No. 111-29 at 15.

Officer Ríos Camacho to then swear in his warrant applications that he had seen Defendant in the possession of a pistol constitutes reckless disregard for the truth.

First, Officer Ríos Camacho only identified one specific location during his testimony where he allegedly saw the Defendant pull a pistol out of a white fanny pack on December 20, 2021. Based on the location identified in Officer Ríos Camacho's testimony, Defendant's private investigator, Mr. Meléndez Cruz, testified that the distance from where Officer Ríos Camacho saw the pistol was 449 feet. Even providing some leeway in that distance, Defendant has shown that it is more likely than not that Officer Ríos Camacho was unable to identify a pistol at so great a distance without a visual aid. Officer Ríos Camacho's testimony made clear that he did not use binoculars when surveilling the residence on December 20, 2021. Defendant's expert witness, Dr. Loftus, testified and created an exhibit which demonstrates that at a distance of 449 feet, Officer Ríos Camacho would not have been able to ascertain that the item which Defendant pulled from the white fanny pack was a pistol, as opposed to a cellphone, wallet, hairbrush, or another object. While Officer Ríos Camacho did testify that the police vehicle in which he was traveling was in movement, thereby giving rise to the possibility that the pistol was seen at more than one distance from the residence, there was no additional testimony from Officer Ríos Camacho identifying any other location with specificity where he saw the pistol again after he first saw Defendant withdraw it from the fanny pack and place it on the column of the second floor balcony. For example, he did not testify where the police vehicle was located when he allegedly saw Defendant put the gun back into the fanny pack. Therefore, it is impossible to determine from the record if the pistol might have been visible at a closer distance.

Next, Officer Ríos Camacho also testified that based on the shape and color of the object handled by Defendant he could tell that it was a pistol. However, many objects are similar in shape and color to a pistol small enough to fit inside a fanny pack, including cellphones,

hairbrushes, or wallets. As shown by the expert testimony and Exhibit BB-5, at a distance of 449 feet, and without binoculars, distinguishing between any of those objects and a gun would have been speculative at best. Nevertheless, Officer Ríos Camacho asserted that based on his experience with firearms, the way that Defendant handled the object also indicated that it was a pistol. While it is credible to believe that a person may handle a firearm differently than they would hand a cellphone, hairbrush, or wallet, Officer Ríos Camacho provided no details as to how exactly the item was being handled which would indicate it was a pistol rather than any other object. Additionally, Mr. Meléndez Cruz, who also possesses 23 years of experience with firearms as a former officer in the Puerto Rico police, testified that based on his experience he would not have been able to identify the item as a pistol at a distance of 449 feet without using an aid such as binoculars. As such, the totality of the evidence indicates that Officer Ríos Camacho's testimony is not credible when he claims to have been able to see a pistol in Defendant's hand at a distance of roughly 449 feet. To include such a statement in his warrant application constitutes reckless disregard for the truth.

Some final comments need to be added regarding Officer Díaz's testimony when he said that he heard from Officer Ríos Camacho that Officer Ríos Camacho had seen a weapon or a pistol. Officer Díaz testified clearly that he did not personally observe Defendant in the possession of any weapon on December 20, 2021, testimony which is credible because Officer Díaz was occupied driving the unmarked surveillance vehicle and was not directly responsible for the surveillance. Officer Díaz also testified that he had visually observed Defendant at the house on December 20, 2021. Now, given the visual constraints on Officer Ríos Camacho, he might have erred on the side of caution in declaring that he saw a weapon for he and his fellow officer's safety. Nevertheless, the evidence shows that it was impossible at the distance identified

by Officer Ríos Camacho to identify with a degree of reasonable probability that the object was a pistol as opposed to any other thing.

### C. WHETHER THE PRESENCE OF A STOLEN VEHICLE PROVIDES PROBABLE CAUSE TO SEARCH A RESIDENCE

In opposing Defendant's request for suppression of the evidence discovered at his residence on December 24, 2021, the Government argues that the sworn statements contain enough allegations, even without Officer Ríos Camacho's statement regarding the firearm, to support a finding of probable cause to search the residence. ECF No. 51 at 10–11.[11] Most importantly, the United States refers to the stolen vehicle parked in the outdoor garage of the residence as adequate to support a finding of probable cause. ECF No. 51 at 10. Defendant conversely argues that the remaining content in the sworn statements of the warrant applications, including the presence of a stolen vehicle, is not enough to provide probable cause to search the residence. ECF No. 47 at 16–17.

The evidence in the record is undisputed that there was a stolen vehicle parked at the residence. Officer Ríos Camacho testified that he first identified a stolen vehicle at the residence during the surveillance of the house on December 20, 2021. ECF No. 104 at 124. The vehicle was a dark blue 2018 Toyota Yaris with license plate number JBW 710. ECF No. 104 at 127; Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111–29 at 15. On December 20, 2021 Officer Ríos Camacho also observed Defendant enter the driver's seat of the blue Toyota Yaris

---

[11] For example, the government argues that the mere fact that "law enforcement suspected the defendant of participating in murders, possessing firearms illegally and stealing vehicles" provides additional support for a finding of probable cause. ECF No. 51 at 11; ECF No. 112 at 94. However, an examination of the warrant applications shows that Officer Camacho merely writes "I was going to be investigating in a working plan in the Fajardo and Naguabo area to gather intelligence relating to various murders that occurred in the town of Fajardo due to the control of drug points. The investigation carried out shows that [Defendant] is living in the town of Naguabo, Mariana ward, and he is a leader of the criminal organization of the Pedro Rosario Nieves Housing Project." Exhibit D, ECF No. 111-28 at 11; Exhibit E, ECF No. 111-29 at 14–15. These statements in the warrant applications are conclusory, and while providing support to justify why Officer Camacho conducted the initial *surveillance*, they are not adequate to support a finding of *probable cause* to search the residence in question, even when combined with the presence of a stolen vehicle.

and leave the premises of that residence with a woman and two minor children. ECF No. 105 at 164. After Defendant left the premises and the surveillance concluded on December 20, 2021, Officer Ríos Camacho testified that he investigated the vehicle and confirmed that the blue Toyota Yaris was in fact a stolen vehicle. ECF No. 105 at 165, 168. When Officer Ríos Camacho resumed the surveillance of the residence on the following day, December 21, 2021, he again observed that the stolen Toyota Yaris was parked at the residence. ECF No. 105 at 169. When the warrants were executed at the residence on December 24, 2021 the stolen Toyota Yaris was found on the property. ECF No. 105 at 174.

In the sworn statements submitted by Officer Ríos Camacho in the warrant applications, Officer Ríos Camacho wrote "[b]ased on my experience as an Agent of the Puerto Rico Police, I consider that in the RESIDENCE DESCRIBED ABOVE (TWO LEVELS), [is] being used for the storage of firearms and a stolen vehicle, for which reason it is very respectfully requested that should this Court find probable cause, it should issue a search and seizure order to be executed day or night against said residence to seize all evidence in violation of the Weapons Law, Act 8 or other illegal articles." Exhibit D, ECF No. 111-28 at 12; Exhibit E, ECF No. 111-29 at 16. Act 8 refers to 9 L.P.R.A. § 3217 under the Puerto Rico statutes, establishing that "[a]ny person who, without violence or intimidation, unlawfully takes a motor vehicle belonging to another person shall be guilty of a third-degree felony." 9 L.P.R.A. § 3217 (Aug. 5, 1987, No. 8, p. 612, § 18). The warrants issued by the Fajardo Municipal Court Judge on December 22, 2021 identify the "TWO-LEVEL RESIDENCE TO BE SEARCHED LOCATED IN THE MARIANA WARD OF THE TOWN OF NAGUABO" authorizing the "search of anything related to violations of Act 8, Puerto Rico Weapons Law or any other illegal thing[.]" Exhibit D, ECF No. 111-28 at 15; Exhibit E, ECF No. 111-29 at 16.

At the <u>Franks</u> hearing, the United States was unable to cite precedent for the proposition that the mere presence of a single, stolen vehicle on premises of a property in and of itself without any other aggravating factors supplies probable cause to search the interior of the residence on that property. <u>See</u> ECF No. 112 at 96–99. Indeed, a review of analogous cases reveals that the finding of probable cause is usually based on additional evidence beyond the presence of a single stolen vehicle on the premises of a property. For example, in <u>United States v. Mendoza-Maisonet</u>, officers of the Puerto Rico Police Department obtained a search warrant for a residence to look for stolen vehicles and firearms after receiving a confidential tip, after observing two vehicles which had been reported stolen parked in front of a residence, and after observing an individual with a pistol in his waistband exit one vehicle and enter the residence. <u>United States v. Mendoza-Maisonet</u>, 962 F.3d 1, 6, 18 (1st Cir. 2020). Based on the tip by the informant and the observations of the two stolen vehicles and the firearm, the Court of Appeals for the First Circuit held that the warrant was supported by probable cause because it could be "infer[red] that there was at least a reasonable likelihood that the stolen cars and firearms would be found in [the] residence (or its premises)." <u>Id</u>. at 18; <u>see also</u> <u>United States v. Knutson</u>, 967 F.3d 754, 757 (8th Cir. 2020) (Finding that there was still probable cause to search a residence even when, under <u>Franks</u>, the challenged statement was struck from the affidavit because informants told police that the defendant sold drugs out of the home, possessed weapons and a stolen car in the residence, and used surveillance to protect his drug activities.); <u>United States v. Bausby</u>, 720 F.3d 652, 657 (8th Cir. 2013) (finding no deliberate or reckless omission in a warrant application after officers determined that a motorcycle in the yard of a residence and at least one automobile among several cars with missing VIN numbers located on a shared driveway of the residence had been reported stolen); <u>United States v. Peterson</u>, 358 F. Supp. 3d

681, 683, 685 (S.D. Ohio 2019) (police officers identified seventeen stolen vehicles relating to a stolen car ring in the garage of a residence).

The case presently before the court presents a scenario that is less compelling than the ones described above. Once the sworn declarations made by Officer Ríos Camacho with respect to any observations that he allegedly made of the Defendant handling or possessing a firearm at the residence in question are removed, the only significant matter remaining in support of the issuance of the search warrants is the fact that a stolen car was seen at the residence and used by the Defendant. Unlike Peterson, here we do not have any evidence of a stolen car ring and multiple stolen cars. Unlike Knutson, here the statements submitted by Officer Ríos Camacho for the issuance of the search warrants do not mention anything about the Defendant selling drugs from his home. Mendoza-Maisonet is also distinguishable because not only did it involve more than one stolen vehicle, but also a firearm, and in the case at bar, in view that I have determined that Officer Ríos Camacho's assertions as to having seen the Defendant with a firearm were made in reckless disregard of the truth, for purposes of the whether the search warrants can still stand the analysis must examine the case as one involving warrants to search a residence due to the presence of a single stolen car and nothing else. Perhaps Bausby gets closer to the circumstances at hand, as it upheld the validity of a search warrant sought for a residence due to the presence of a stolen automobile and a stolen motorcycle. In Bausby, while there were several vehicles with missing VIN numbers and a specific car which had been reported stolen, those vehicles were located in an unfenced, "shared driveway" between the defendant's residence and his neighbor's home. Bausby, 720 F.3d at 655. Therefore, in Bausby, the only stolen vehicle clearly linked to the defendant's home was the stolen motorcycle located in the fenced front yard of the house. Id. at 654.

Defendant contends that "[t]he nature of the alleged stolen automobile's *corpus delicti* limits the scope of a search warrant to the car itself. There was no observation of exchange of car tags, documentation or other evidence that would support a search of the residences under Act 8. The search warrant based on the stolen nature of the vehicle allowed for the search of the vehicle within the curtilage of the home, not the home itself." ECF No. 47, at 17. In support of his reasoning, Defendant relies on Collins v. Virginia, 138 S.Ct. 1663 (2018). Collins, however, is clearly distinguishable from the circumstances currently under the court's purview. In Collins, a police officer, from the street, saw at Ryan Collins' residence a motorcycle that he suspected to be stolen. The police officer,

> who did not have a warrant, exited his car and walked toward the house. He
> stopped to take a photograph of the covered motorcycle from the sidewalk, and
> then walked onto the residential property and up to the top of the driveway
> where the motorcycle was parked. In order "to investigate further," … [the police
> officer] pulled off the tarp, revealing a motorcycle that looked like the one from
> the speeding incident. He then ran a search of the license plate and vehicle
> identification numbers, which confirmed that the motorcycle was stolen. After
> gathering this information, … [the police officer] took a photograph of the
> uncovered motorcycle, put the tarp back on, left the property, and returned to his
> car to wait for Collins.

Id. at 1668. Eventually, Mr. Collins returned home, the police officer walked up to the front door and knocked, Mr. Collins agreed to speak to the police, and admitted that the motorcycle was his and that he bought it without title. Mr. Collins was then arrested.

In disapproving the police officer's actions in Collins, the U.S. Supreme Court held that

> Just as an officer must have a lawful right of access to any contraband he
> discovers in plain view in order to seize it without a warrant, and just as an officer
> must have a lawful right of access in order to arrest a person in his home, so, too,
> an officer must have a lawful right of access to a vehicle in order to search it
> pursuant to the automobile exception. The automobile exception does not afford
> the necessary lawful right of access to search a vehicle parked within a home or
> its curtilage because it does not justify an intrusion on a person's separate and
> substantial Fourth Amendment interest in his home and curtilage.

25

Id. at 1672. Hence, the issue being decided in Collins is not whether a police officer can seek a search warrant for the residence where a stolen motorcycle is parked. The issue decided in Collins is whether "the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle *without a warrant*." Id. at 1671 (emphasis added).

In the case presently before the court, there is nothing either in the sworn statements made by Officer Ríos Camacho to obtain the search warrants or the testimony introduced at the Franks hearing indicating that Officer Ríos Camacho or Officer Díaz ever entered without a warrant the curtilage of the Defendant's residence while conducting surveillance. To the contrary, the evidence at the Franks hearing showed observations made at quite a distance (e.g., 449 feet, 515 feet, 598 feet, 749 feet). Defendant's reference to Collins, therefore, is inapposite.

The question then is whether the presence of a stolen vehicle in the curtilage of a home constitutes probable cause to seek the issuance of a warrant to search the residence. The answer to this inquiry cannot be made in a factual vacuum. First, Officer Ríos Camacho was able to determine that the blue Toyota Yaris with license plate JBW 710 had a "theft lien." Second, he had the opportunity to see this vehicle both when the Toyota Yaris was parked at the residence as well as in movement. Third, there was reason to believe that the presence of the Toyota Yaris was not a mere coincidence, as it was seen by Officer Ríos Camacho at the residence on more than one day, and at least once the Defendant was seen in the vehicle. Therefore, a reasonable inference could be made that a resident of the home was regularly using the vehicle. Now, perhaps under these circumstances it might be suggested that a "knock and talk" would suffice to corroborate whether the occupant of the residence had legal title to the vehicle. However, according to the sworn statements in support of the search warrants, Defendant was under investigation for several murders and the operation of drug points. While the mere fact that the Defendant was under investigation in and of itself is insufficient to meet the threshold of

26

probable cause for a search warrant, the availability of a less intrusive approach is not an impediment for law enforcement officers to seek a search warrant, either due to safety concerns or to avoid the destruction of evidence, when they have probable cause to seek a search warrant on grounds independent from the Defendant simply being the subject of an investigation.

The Defendant sustains that Officer Ríos Camacho could only seek a search warrant for the Toyota Yaris, not the residence where he lived. Nevertheless, this restrictive view neglects to take into account the fact that the keys to the stolen vehicle could be inside the residence, that personal property of the victim who legally owned the Toyota Yaris may have been removed from the car and placed inside the residence (thus further corroborating the stolen nature of the vehicle), and that the title documents of the car could also be inside the residence, among other matters. In his <u>Franks</u> motion, Defendant fails to articulate with specificity why in the process of searching for those items pertaining to the stolen Toyota Yaris, the law enforcement officers executing the search warrants at issue would not have encountered the firearm or the drugs for which the Defendant has been indicted. Nor has Defendant indicated how the search of the Defendant's residence somehow exceeded the scope of the search warrants when viewed under the prism of a search limited to matters related to a stolen vehicle. <u>Horton v. California</u>, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more.").

## V. CONCLUSION

In light of the fact that (1) after excising from the sworn statements made in support of the issuance of the search warrants at issue those portions that were made in reckless disregard of the truth there was still probable cause to execute the search of the residence for evidence related to a stolen vehicle and (2) Defendant has not raised specific arguments as to why law

enforcement officers would not have inevitably discovered the drugs and firearm while searching for evidence related to a stolen vehicle, the Defendant's motion to suppress evidence pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (ECF No. 47) should be DENIED. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150–51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 18th day of September, 2023.

s/Marcos E. López
U.S. Magistrate Judge